<u>In The United States District Court For The Southern District of Ohio Western</u>

| | |
|---|---|
| United States of America | Criminal No.CR-1-0090(-2) |
| VS. | |
| RAYMOND DOUTHIT | Honorable judge: Sandra S.Beckwith |

<u>Defendant's motion for the appointment of counsel for §3582(C)</u>

Now comes the Defendant, <u>**RAYMOND DOUTHIT**</u> respectfully moves this Honorable Court for an Order appointing counsel, in support there of, a sentencing court's authority to reopen and, if appropriate, reduce a sentence under §3582 (C) (2) is triggered when the sentence was "based on a sentencing range that has subsequencely been lowered by the U.S. sentencing commission pursuant to "it's power to review and revise...the guidelines." The crack amendment clearly fits within that description. Effective November 1, 2007, the U.S. Sentencing Commission lowered sentencing ranges for crack offenses by two offense levels because it found that the crack guideline over punished crack offenders and created unwarranted disparity between them and other drug offenders. On December 11, 2007, the commission voted to give retroactive effect as of March 3, 2008 to the amendment to the crack guideline, and it also voted to amend §1B1.10 in ways that could be used to reduce the two level reduction. Nothing more is needed to trigger the court's authority to revisit a sentence unde §3582 (C) (2).

<u>Brief In Support of Motion for Appointment of Counsel</u>

The United States Sentencing Commission, special report to Congress, Cocaine and Federal Sentencing Policy, issued a series of reports stating the problems with the crack/powder disparity. The related problems are well known and well documented. In Kimbrough vs. United States, 128 s ct. 558,566 (2007), the United States Supreme Court identified major issues associated with the differential

treatment of crack and powder offenders, "The opinion of the court," we begin with some background on the different treatment of crack and powder cocaine under the federal sentencing laws. Crack and powder cocaine are two forms of the same drug. Powder cocaine, or cocaine hydrochloride, is generally inhaled through the nose; it may also be mixed with water and injected. See United States Sentencing Commission, Special Report to Congress: Cocaine and Federal Sentencing Policy 5, 12 (Feb. 1995), available at http://www.ussc.gov/crack/exec.htm (herein after 1995 Report). Crack cocaine, a type of cocaine base, is formed by dissolving powder cocaine and baking soda in boiling water. Id., at 14. The resulting solid is divided into single dose "rocks" that users smoke. The active ingredient in powder and crack cocaine is the same. The two forms of the drug also have the same psychological and psychtropic effects, but smoking crack allows the body to absorb the drug much faster than inhaling powder cocaine, and thus produces a shorter, more intense high. Although chemically similar, crack and powder cocaine are handled very differently for sentencing purposes. The 100-to-one ratio yields sentences for crack offenses three to six times longer than those for powder offenses involving equal amounts of drugs. See United States Sentencing Commission Report to Congress: Cocaine and Federal Sentencing Policy IV (May 2002). Available at http://www.ussc.gov/gov/r_congress/02crack/2002crackrpt.pdf (herein after 2002 Report). This disparity means that a major supplier of powder cocaine may receive a shorter sentence than a low level dealer who buys powder from the supplier but then converts it to crack. See 1995 Report 193-194.

The crack/powder disparity originated in the Anti-Drug Abuse Act of 1986 (1986 Act), 100 stat.3207. The 1986 Act created a two-tiered scheme of five and ten year mandatory minimum sentences for drug manufacturing and distribution offenses. Congress sought "to link the ten year mandatory minimum trafficking prison term to major drug dealers and to link the five year minimum term to serious traffickers." 1995 Report 119. The 1986 Act uses the weight of the drug

involved in the offense as the sole proxy to identify "major and serious" dealers. For example, any defendant responsible for 100 grams of heroin is subject to the five year mandatory minimum, see 21 U.S.C. §841 (6)(1)(B)(i)(2000 ed. and SuppV), and any defendant responsible for 1000 grams of heroin is subject to the ten year mandatory minimum, see §841(6)(1)(A)(i).

Crack cocaine was a relatively new drug when the 1986 Act was signed into law, but it was already a matter of great public concern: "drug abuse in general, and crack cocaine in particular, had become in public opinion and in members' minds a problem of overwhelming dimensions." 1995 Report 121. Congress apparently believed that crack was significantly more dangerous than powder cocaine in that: (1) crack was highly addictive; (2) crack users and dealers were more likely to be violent than users and dealers of other drugs; (3) crack was more harmful to users than powder, particularly for children who had been exposed by their mother's drug use during pregnancy; (4) crack was especially prevalent among teenagers; and (5) crack's potency and low cost were making it increasingly popular. See 2002 Report 90.

Based on these assumptions, the 1986 Act adopted a "100-to-one ratio" that treated every gram of crack cocaine as the equivalent of 100 grams of powder cocaine. The act's five year mandatory minimum applies to any defendant accountable for 5 grams of crack or 500 grams of powder, 21 U.S.C. §841(6)(1)(B)(ii),(iii); it's ten year mandatory minimum applies to any defendent accountable for 50 grams of crack or 5000 grams of powder, §841(6)(1)(A)(ii),(iii). While Congress was considering adoption of the 1986 Act, the Sentencing Commission was engaged in formulating the sentencing guidelines. In the main, the commission developed guideline sentences using an empirical approach based on data about past sentencing practices, including 10,000 presentence investigation reports. See U.S.S.G. §1A.1, intro. comment., pt. A,13 The commission "modified and adjusted past practice in the interests of greater rationality, avoid inconsistency, complying with congressional instructions, and the like. "Rita v. United States,

551 U.S. (2207).

The Commission did not use this empirical approach in developing the guideline sentences for drug trafficking offenses. Instead, it employed the 1986 Act's weight driven scheme. The guidelines use a drug quantity table based on drug type and weight to set base offense levels for drug trafficking offenses. See U.S.S.G. §2D1.1(c). In setting offense levels for crack and powder cocaine, the Commission, in line with the 1986 Act, adopted the 100-to-one ratio. The statute itself specifies only two quantities of each drug, but the guidelines "go further and set sentences for the full range of possible drug quantities using the same 100-to-one quantity ratio." 1995 Report 1.

The guideline's drug quantity table sets base offense levels ranging from 12, for offenses involving less than 250 milligrams of crack (or 25 grams of powder), to 38, for offenses involving more than 1.5 kilograms of crack, (or 150 kilograms of powder). U.S.S.G. §2D1.1(c). Although the Commission immediately used the 100-to-1 ratio to define base offense levels for all crack and powder offenses, it later determined that the crack/powder sentencing disparity is generally unwarranted. Based on additional research and experience with the 100-to-1 ratio, the Commission concluded that the disparity "fails to meet the sentencing objectives set forth by Congress in both the Sentencing Reform Act and the 1986 Act." 2001 Report 91. In a series of reports, the Commission identified "three problems with crack/powder disparity. First, the Commission reported, the 100-to-1 ratio rested on assumptions about "the relative harmfulness of the two drugs and the relative prevalence of certain harmful conduct associated with their use and distribution that more recent research and data no longer support." Ibid; see United States Sentencing Commission, Report to Congress: Cocaine and federal sentencing policy 8 (May 2007), available at http://www.ussc.gov/r_congress/cocaine2007.pdf (herein after 2007 Report) (Ratio Congress embedded in the statute for "overstat(s)" both "the relative harmfulness" of crack cocaine, and the "seriousness of most crack cocaine offenses"). For example, the Commission found

that crack is associated with "significantly less trafficking related violence... than previously assumed." 2002 Report 100. It is also observed that "the negative effects of prenatal crack cocaine exposure are identical to the negative effects of prenatal powder cocaine exposure." Id. at 94. The Commission furthermore noted that "The epidemic of crack cocaine use by youth never materialized to the extent feared." Id. at 96. Second, the Commission concluded that the crack/powder disparity is inconsistent with the 1986 act's goal of punishing major drug traffickers more severly than low level dealers. Drug importers and major traffickers generally deal in powder cocaine, which is then converted into crack by street level dealers. See 1995 Report 66-67. But the 100-to-1 ratio can lead to the "anomalous" result that retail crack dealers get longer sentences than the wholesale drug distributors who supply them the powder cocaine from which their crack is produced." Id. at 174.

Finally, the Commission stated that the crack/powder sentencing differential "fosters disrespect for and lack of confidence in the criminal justice system "because of a widely held perception" that it "promotes unwarranted disparity based on race." 2007 Report 103. Approximately 85 percent of defendants convicted of crack offences in federal court are black; thus the severe sentences required by the 100-to-1 ratio are imposed "primarily upon black offenders." Despite these observations, the Commission's most recent reports do not urge identical treatment of crack and powder cocaine. In the Commission's view, "some differential in the quantity-based penalties "for the two drugs is warranted. id. at 102, because crack is more addictive than powder, crack offenses are more likely to involve weapons or bodily injury, and crack distribution is associated with higher levels of crime, see id. at 93-94, 101-102. But the 100-to-1 crack/powder ratio, the Commission concluded, significantly overstates the differences between the two forms of the drug. Accordingly, the Commission recommended that the ratio be "substantially" reduced.

The Commission has several times sought to achieve a reduction in the

crack/powder ratio. In 1995, it proposed amendments to the guidelines that would have replaced the 100-to-one ratio with a one-to-ratio. Complimenting that change, the Commission would have involving weapons or bodily injury. See Amendments to the Sentencing Guidelines for United States Courts, 60 Fed. Reg. 25075-25077 (1995) Congress, acting pursuant to 28 U.S.C. §994(p). Rejected the amendments. See Pub. 1. 104-38, :1, 109 stat. 334. Simultaneously, however, Congress directed the Commission to "propose revision of the drug quantity ratio of crack cocaine to powder cocaine under the relevant statutes and guidelines. §2(a)(2),id.,at 335. In response to this directive, the Commission issued reports in 1997 and 2002 recommending that Congress change the 100-to-1 ratio prescribed in the 1986 Act. The 1997 report proposed a 5-to-1 ratio. See United States Sentencing Commission, Special Report to Congress; Cocaine and federal sentencing policy 2 (Apr. 1997), http://www.ussc.gov/r_congress/newcrack.pdf. The 2002 report recommended lowering the ratio "at least" to 20 to 1. 2002 Report viii. Neither proposal prompted congressional action. The Commission's most recent report, issued in 2007, again urged Congress to amend the 1986 Act to reduce the 100-to-1 ratio. This time, however, the Commission did not simply await congressional action. Instead, the Commission adopted an ameliorating change in the guidelines. See 2007 Report 9. The alteration, which became effective on November 1, 2007, reduces the base offense level associated with each quantity of crack by two levels. See Amendments to the sentencing guidelines for United States Courts, 72 Fed. Reg. 28571-28572 (2007). This modest amendment yields sentences for crack offenses between two and five times longer than sentences for equal amounts of powder. Describing the amendment as "only a partial remedy" for the problems generated by the crack/powder disparity, the Commission noted that "any comprehensive solution requires appropriate legislative action by Congress," 2007 Report Thee United States Supreme Court alluded to the sentencing Commission's report criticizing the 100-to-1 ratio, cf. :3553(a)(5)(suppV), noting that the Commission "recognizes that crack cocaine has not caused the damage that the Justice Department

alleges it has." App. 72

The Supreme Court went on and said with, this history of the crack/powder sentencing ratio in mind, we next consider the status of the guidelines tied to the ratio after our decision in United States v. Booker, 543 U.S. 220(2005). In Booker, the court held that the mandatory sentencing guidelines system violated the sixth amendment. See id., at 226-227. The Booker remedial opinion determined that the statute that rendered the guidelines mandatory, 18 U.S.C. §3553(b)(1) (2000ed., suppIV) This modification of the federal sentencing statute, we explained, "makes the guidelines effectively advisory." 543 U.S. at 245. The statute, as modified by Booker, contains an overarching provision instructing district courts to "impose a sentence sufficient, but not greater than necessary" to accomplish the goals of sentencing, including "to reflect the seriousness of the offense," "to promote respect for the law," "to provide just punishment for the offense," "to afford adequate deterrence to criminal conduct," and "to protect the public from further crimes of the defendant." 18 U.S.C. §3553(a)(2000 ed. and supp. V). The statute further provides that, in determining the appropriate sentence, the court should consider a number of factors, including "the nature and circumstance of the offense," "the history and characteristics of the defendant," "the sentencing range established by the guidelines," "any pertinent policy statement " issued by the U.S. Sentencing Commission pursuant to it's statutory authority, and "the need to avoid unwanted sentence disparities among defendants with similar records who have been found guilty of similar conduct." In sum, while the statute still requires a court to give respectful consideration to the guidelines, see Gall v. United States, ante, at 7, 11, Booker permits the court to tailor the sentence in light of other statutory concerns as well," 543 U.S., at 245-246.

According to the Commission, in determining whether a reduction is warranted at all, and the extent of such reduction thee court "shall consider" the §3553(A) factors, "shall consider the nature and seriousness of the danger to any person

or the community that may be posed by a reduction in the defendant's term of imprisonment," and may consider post-sentencing conduct of the defendant that occurred after imposition of the original term of imprisonment. See amendment §1B1.10, comment. Thus, even the courts that decide to strictly follow the policy statement must make three separate factual determinations in addition to those made at the initial sentencing.

In any situation where new facts have to be marshaled and new arguments have to be made in aid of the court's sentencing decision, the sixth amendment requires the assistance of counsel. See Mempa v. Rhay, 389 U.S. 128 (1967). In Mempa, the Supreme Court held that the right to counsel attaches to any stage of a criminal proceeding where substantial rights of the defendant may be affected, including a probation revocation hearing. In so holding, the court rejected the state's argument that Washington's probation revocation hearing  was not a "sentencing occurred long before any revocation proceeding was "a mere formality" at which the court exercised very little discretion under the state statute, counsel was constitutionally unnecessary. See id. at 135. The court acknowledged that the state statute required the judge to impose the maximum sentence for the offense and the character of the defendant. "Obviously to the extent such recommendations are influential in determining the resulting sentence, the necessity for the aid of counsel in marshaling the facts, introducing evidence of mitigating circumstances, and in general aiding and assisting  the defendant to present his case as to sentence is apparent. See U.S. v. Tidwell, 178 F.3d 946,949,(7th cir, 1999) district court has discretion to decide whether to appoint counsel in §3582(c)(2) hearing); U.S. vs. Townsend, 98 F.3d510, 512(9th cir 1996) decision to appoint counsel in a §3582(c)(2) motion is discretionary);

After U.S. vs. Booker and amended §1B1.10, Mempa requires counsel in §3852(c) First, there is no question that in a §3582(c)(2) proceeding, as in Mempa, defense counsel is necessary to aid in calculating the revised guideline range, marshal the facts and evidence that pertain to the applicable §3553(A)

factors, defend against any allegation that public safety or post-sentence conduct should result in a denial of the reduction or a lesser reduction, and assist the defendant in presenting his motion. Even if a court does not permit the defendant to argue for more than a two level reduction, he or she will still have to marshal new fact based arguments to use or defend against the three matter listed in note 1(B) of revised §1B1.10. Thus, Mempa requires counsel second, as in Mempa, Important legal right must be raised at the 3582(c)(2) hearing or they will be lost. See Mempa, 389 U.S. at 135. Included are the right to appeal the sentence imposed, and rights that must be raised, litigated and, if necessary, preserved, such as the right to be resentenced under an advisory guideline system. Third, and closely related is the concern that, if the district court refuses to treat §1B1.10 as advisory, the defendant will once again be sentenced on the basis of facts that were not found by a jury or admitted by the defendant. Mempa, 398 U.S. at 136-137 (the ability of defense counsel to assist defendant and potential loss of legal right assumed increased significance when it is considered that, as happened in these two cases, the eventual imposition of sentence on the prior plea of guilty is based on the alleged commission of offenses for which the accused is never tried.

At the very least, defense counsel can ensure a smoother process for §3582(c)(2) resentencings, remind the court of the numerous institutional efficiencies furthered by appointing counsel, including the increased likelihood of arriving at a negotiated settlement, since the government cannot negotiate directly with a defendant. It is also worth pointing out to the court that the Department of Justice's major concern in opposing retroactivity was the institutional burden on the courts. If the Department is truely concerned about minimizing that burden and encouraging the efficient resolution of crack resentencings, the best way to do that is to appoint counsel. See Halbert v. Michigan, 545 U.S. 605,623 (no one questions that the appointment of counsel

at state expense would be more efficient and helpful not only to defendants, but also to the courts.")

The absence of counsel risks constitutional error. The Supreme Court has long recognized the key due process role that defence counsel plays in ensuring the accuracy and reliability of sentencing proceedings. In Townsend vs. Burke, 334 U.S. 736, 740-41(1948), the court found pre-Gideon that even though due process did not generally require the state to provide counsel when accepting a guilty plea and imposing sentence in a non-capital case, the absence of counsel did violate due process when the defendant was sentenced on the basis of assumptions concerning his criminal record that corrected the errors on which the defendant was sentenced, the absence of counsel made the constitutional difference: In this case, counsel might not have changed the sentence, but he could have taken steps to see that the conviction and sentence were not predicated on misinformation or misreading of courts records, a requirement of fair play which absence of counsel withheld from this prisoner. Id, at 741. The same is true here, where defense counsel will raise and correct errors in reading the record, applying the guideline, or other errors that may otherwise go unnoticed. Refusing to appoint defense counsel for indigent defendants in §3582 (c)(2) proceedings may raise additional due process and equal protection concerns. Even where a particular avenue for relief is not constitutionally required, if such an avenue is provided by statute, the government may not thereafter "bolt the door to equal justice to indigent defendants. See Halbert v. Michigan, 545 U.S. 605,610 (2005) quoting Griffin v. Illinois, 351 U.S. 12,24 (1956) Internal quotation marks omitted). In finding a right to counsel on a discretionary first appeal from a guilty plea, the Supreme Court noted that "navigating the appellate process without a lawyer's assistance is a perilous endeavor for a layperson, and well beyond the competence of individuals...who have little education, learning disabilities and mental impairments. The same is true for those defendants who may be forced to litigate their own §3582 (c)(2)

motion, which would entail being conversant not only with the record at sentencing and any intervening aggravating or mitigating factors (including those listed in amended note 1(B) to revised §1B1.10) that were never litigated, but also with the effects of Booker, Kimbrough, and Gall. With an average of over two years at stake, and no countervailing legitimate interest in a sloppy incomplete presentation, the balance of interest requires counsel. Furthermore, Honorable Judges, all over the country are appointing counsel for indigent defendants!

For all thee reason set forth, the defendant pray that this Honorable Court issue an order appointing counsel, for the 3852(c)(2) motion.

RESPECTFULLY SUBMITTED

BY: *Raymond Nouthit*